**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **RONALD MCDONALD HOUSE CHARITIES OF CHICAGOLAND AND NORTHWEST INDIANA, INC.,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **No. 13 CV 1430** ) ) |
| **WINNING CHARITIES ILLINOIS, LLC, et al.,** | ) **Magistrate Judge Michael T. Mason** ) ) |
| **Defendants.** | ) |
| _____ | ) |
| **WINNING CHARITIES ILLINOIS, LLC,** | ) ) |
| **Counter-Plaintiff,** | ) ) |
| **v.** | ) ) |
| **RONALD MCDONALD HOUSE CHARITIES OF CHICAGOLAND AND NORTHWEST INDIANA, INC.,** | ) ) ) ) |
| **Counter-Defendant.** | ) ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Michael T. Mason, United States Magistrate Judge:

Before the Court is plaintiff/counter-defendant Ronald McDonald House Charities of Chicagoland and Northwest Indiana's ("plaintiff" or "RMHC") motion to dismiss defendant/counter-plaintiff Winning Charities of Illinois's ("defendant" or "WCI") counterclaim and strike immaterial allegations pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f) [31]. For the reasons set forth below, RMHC's motion to dismiss is granted in part and denied in part. WCI's counterclaim is dismissed with leave to re-plead as permitted below. If WCI chooses to file an amended counterclaim,

it must do so by November 25, 2013.  RMHC shall answer or otherwise plead by December 16, 2013.

## I.    Background

On February 22, 2013, RMHC filed a seven-count complaint [1] against defendants WCI, Winning Charities, Inc., Charity Assurance Group, LLC, and William Bayles.  RMHC is a not-for-profit corporation "whose mission is to care for families of children with complex medical needs by providing comfort, compassion and community." (Compl. ¶ 3.)  Defendants provide fundraising services to charities.  (*Id.* ¶ 1.)

According to the allegations of plaintiff's complaint, in August 2011 and February 2012, RMHC and WCI entered into contracts under which WCI was to raise funds for RMHC through a "media intense charity raffle."  (Compl. ¶ 14.)  Over the course of 2011 and 2012, RMHC fronted funds for the raffle, which was overseen by WCI and likely the other defendants.  (*Id.* ¶ 15.)  Unfortunately, the raffle was unsuccessful, resulting in an alleged loss of approximately $2.8 million to RMHC.  (*Id.* ¶ 16.)  As a result of the loss, RMHC initiated an arbitration proceeding against WCI.  (*Id.* ¶ 17.)

On November 20, 2012, the parties met to discuss settlement of their dispute involving the unsuccessful raffle.  (Compl. ¶ 17.)  During that meeting, the parties purportedly reached an agreement whereby (1) defendants would pay RMHC $1,100,000 through installment payments; (2) defendants would post specified security; and (3) defendants would provide certified financial statements and representations and warranties regarding litigation.  (*Id.* ¶ 19.)  In the event the defendants missed an installment payment, the entire amount became due in the form of an arbitration award in the amount of $1,100,000 less any installment payments made.  (*Id.* ¶ 20.)

Following the November 20, 2012 meeting, the parties purportedly exchanged e-mails confirming the agreement, as well as drafts of a formal written agreement. (Compl. ¶¶ 21-22; Ex. A.)  Then, on December 31, 2012, defendants' counsel called plaintiff's counsel to advise him that "defendants were unilaterally backing out of the contract."  (*Id.* ¶ 23.)  Defendants failed to pay the first two installment payments that were due on January 4, 2013 and February 15, 2013, and further advised plaintiff that they would not be making any payments.  (*Id.* ¶ 24.)  This action followed.  Plaintiff's complaint includes claims for breach of contract, specific performance, fraudulent misrepresentation, unjust enrichment, promissory estoppel, promissory fraud, and equitable estoppel.

Defendants moved to dismiss plaintiff's complaint for failure to state a claim [12]. The District Court denied defendants' motion on May 3, 2013 [16].  Defendants then filed their answer to the complaint [23] and defendant WCI filed a counterclaim [24] against RMHC.  The allegations of WCI's counterclaim, which are more detailed than the facts alleged in plaintiff's complaint, and which we accept as true for purposes of the motion to dismiss, are as follows.  *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010); *see also, e.g.*, *Organ Recovery Sys. v. Preservation Solutions, Inc.*, No. 11 C 4041, 2012 WL 2577500, at *1 (N.D. Ill. July 4, 2012) (internal citations omitted) ("[T]he Court takes as true the facts alleged by the party whose complaint or counterclaim is challenged.").

WCI's affiliated companies have operated over a period of twenty years to raise money for Canadian charities.  (Countercl. ¶ 17.)  WCI was created as a separate legal entity with the goal of expanding the affiliated companies' charity fundraising success to

3

the U.S. market. (*Id.* ¶ 20.) WCI's first charity fundraiser in the U.S. was with RMHC. (*Id.* ¶ 22.)

In August 2011, WCI and RMHC entered into a consultancy contract (the "August 2011 Consultant Contract"), whereby WCI agreed to provide consulting services for four fundraising raffles over a two-year period using its "media intense charity raffle" methodology. (Countercl. ¶¶ 24, 29; Ex 1.) Contemporaneously with the August 2011 Consultant Contract, the parties executed an indemnity contract (the "August 2011 Indemnity Contract"), which protected RMHC from net losses upon completion of the four raffles. (*Id.* ¶¶ 4, 30.) The August 2011 Indemnity Contract was eventually superseded in its entirety by the "February 2012 Indemnity Contract." (*Id.* ¶¶ 6, 31; Ex. 2.)

The parties understood that "Raffle 1" was an "investment phase" of the four-raffle sequence. (Countercl. ¶ 26.) As such, Raffle 1 was intentionally scaled back financially in order to minimize investment risk, but remain large enough to validate the Canadian fundraising process in the Chicago market. (*Id.*) In advance of and during Raffle 1, WCI provided RMHC market validation studies featuring several successful Canadian raffle programs in order to demonstrate how the "investment phase" operated and to relieve any potential concerns regarding the overall success of the four-raffle sequence. (*Id.* ¶ 27.) WCI also provided RMHC with a range of possible Raffle 1 outcomes, ranging from a $1.5 million profit to a potential investment loss of up to $3 million. (*Id.* ¶ 28.) According to WCI, its fundraising strategy required utilizing the existing donor list of both RMHC and Children's Memorial Hospital, who planned to share any profits earned. (*Id.*)

4

Raffle 1 was launched in the Fall of 2011 using the methodology provided by WCI. (Countercl. ¶ 32.) Chicago Tribune Direct conducted an independent marketing audit of Raffle 1, which revealed a net investment loss of $2,839,376.92. (*Id.* ¶¶ 33-34.) That loss included over $900,000 in media and program expenses paid by WCI on behalf of RMHC, and a consulting fee owed by RMHC to WCI, neither of which have yet been paid to WCI. (*Id.* ¶ 36.) As alleged by WCI, Raffle 1 underperformed in part because RMHC and Children's Memorial Hospital failed to provide the agreed-upon list of donors pursuant to the August 2011 Consultant Contract. (*Id.* ¶ 35.) In any event, Raffle 1's outcome was still within the range of possible outcomes that WCI provided to RMHC prior to the raffle. (*Id.*)

Upon mutual review of the audit, the parties agreed to move forward with the next three raffles. (Countercl. ¶ 37.) It was at this point that the parties executed the aforementioned February 2012 Indemnity Contract. (*Id.*) Charity Assurance Group, which was formed specifically as guarantor against net losses, was added as an additional party to that contract. (*Id.* ¶ 38.)

Raffle 2 was scheduled for the Spring of 2012, but RMHC unilaterally cancelled the rollout of Raffle 2 due to issues of timing and branding. (Countercl. ¶ 40.) Prior to the cancellation of Raffle 2, WCI committed resources and declined other economic opportunities in order to consult with RMHC. (*Id.* ¶ 41.) As RMHC was made aware, the cancellation of Raffle 2 jeopardized WCI's access to Raffle 2 operational funds because the terms of the funding would now extend beyond WCI's standard 90-day repayment terms with its lender bank. (*Id.* ¶ 42.) As a result, WCI started to seek alternative investor financing. (*Id.* ¶ 43.)

5

In February 2012, Doug Porter, a representative of RMHC, authorized the necessary paperwork for WCI to obtain alternative financing from investment group Amerifactors in the way of annual funding up to $12 million and an initial credit line of $4 million to launch Raffle 2. (Countercl. ¶ 44.) However, when a representative from Amerifactors contacted Porter to confirm his stamped signature, Porter alleged that his signature was unauthorized. (*Id.* ¶ 45.)

By March 2012, WCI learned that RMHC was considering not moving forward with the remaining three raffles. (Countercl. ¶ 46.) RMHC also orally demanded changes in the terms of the February 2012 Indemnity Contract regarding the source of raffle investment funding at Charity Assurance Group to over $5 million in assets. (*Id.* ¶ 47.) From March 2012 through May 2012, WCI, through its investment banker Michael McNinch, met with RMHC officials to try to understand and meet RMHC's new demands. (*Id.* ¶¶ 48-49.) In May 2012, McNinch met with RMHC's William Bayles to discuss the funding of the raffle program. (*Id.* ¶ 50.) McNinch reported that an additional sixty days would be required to secure investment funding based on RMHC's new demands. (*Id.*) RMHC then agreed to operate Raffle 2 in the Fall of 2012. (*Id.*)

WCI informed its new investors of RMHC's change in position regarding the source of investment funding. (Countercl. ¶ 51.) The investors sought assurances from RMHC that all contracted raffles would be conducted. (*Id.*) RMHC refused to provide any such assurances and also cancelled the $4 million credit line for Raffle 2. (*Id.* ¶¶ 52-53.) WCI continued to seek alternative investment funding. (*Id.* ¶¶ 54-55.)

On July 19, 2012, RMHC filed its arbitration demand with the American Arbitration Association. (Countercl. ¶ 54.) As discussed above, the parties met on

November 20, 2012 to, according to WCI, "discuss the future of RMHC's media intense raffle program." (*Id.* ¶ 56.) At that meeting, WCI laid out a new mitigating capital plan that would fund the remaining three raffles and completely cover the program costs with WCI investment capital, putting no RMHC funds at risk. (*Id.* ¶ 57.) RMHC rejected this plan and refused to perform Raffles 2,3, and 4. (*Id.* ¶¶ 57-58.)

The parties then discussed a possible settlement for their dispute, including installment payments from WCI to RMHC that would mitigate the net investment loss from Raffle 1. (Countercl. ¶ 59.) WCI contends that "it was always understood" that any settlement would include "favorable trade language" to protect WCI's reputation as it continued to undergo fundraising efforts in the U.S. (*Id.* ¶ 60.)

Following the November 20, 2012 meeting, the parties' settlement efforts continued as they attempted to negotiate favorable trade language, as well as other material terms of a potential agreement. (Countercl. ¶ 62.) However, in December 2012, RMHC advised WCI that it would not include favorable trade language in any settlement agreement. (*Id.* ¶ 64.) Thereafter, WCI rejected RMHC's final settlement offer. (*Id.*)

WCI's counterclaim includes only one count for breach of contract of the August 2011 Consultant Contract and the February 2012 Indemnity Contract, but purports to allege four distinct breaches of those contracts. Those purported breaches include (1) RMHC's oral demand to change the February 2012 Indemnity Contract's terms regarding the source of raffle investment funding; (2) RMHC's cancellation of the $4 million line of credit for the launch of Raffle 2; (3) RMHC's termination of Raffles 2, 3, and 4; and (4) RMHC's decision to file the instant matter instead of arbitrating the

parties' dispute.  WCI seeks to recover $1,111,887.43, which includes Raffle 1 expenses, a consulting fee, and the contractually provided liquidated damages. (Countercl. ¶ 76.)  WCI also seeks punitive damages.  (*Id.* ¶ 77.)

RMHC now asks the Court to dismiss WCI's counterclaim, arguing that WCI has failed to state a claim for breach of contract and that the counterclaim contains certain information that must be stricken.  RMHC also argues that WCI's counterclaim includes improper requests for punitive and compensatory damages.

## II.    Legal Standard

### A.    Motion to Dismiss Pursuant to Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissal is proper where a complaint or counterclaim fails to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As a general rule, the court may consider only the pleading at issue on a Rule 12(b)(6) motion.  *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).  Rule 10(c) provides, however, that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).

### B.    Motion to Strike Pursuant to Rule 12(f)

A court may, on its own or on a motion made by a party, "strike from a pleading

an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Fed. R. Civ. P. 12(f). "[M]otions under Rule 12(f) are viewed with disfavor ... and are

infrequently granted." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1380 (3d ed. 2004). "Courts will strike portions of a complaint only if the

challenged allegations are so unrelated to the present claim as to be void of merit and

unworthy of consideration." *Geschke v. Air Force Ass'n*, 02 C 50271, 2002 WL

31253746, at *1 (N.D. Ill. Oct. 8, 2002); *see also Vakharia v. Little Co. of Mary Hosp. &*

*Health Care Ctrs.*, 2 F. Supp. 2d 1028, 1033 (N.D. Ill.1998) ( "A movant bears the

burden of demonstrating that the challenged allegations are so unrelated to plaintiff's

claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial.").

## III.   Analysis

In its motion to dismiss, RMHC first argues that WCI has failed to point to any

express provisions of the contracts at issue supporting its allegations of breaches

discussed above.  Indeed, to state a claim for breach of contract under Illinois law, a

party must allege "(1) the existence of a valid and enforceable contract; (2) substantial

performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant

damages."[1]  *Reger Dev.,* 592 F.3d at 764 (*quoting W.W. Vincent & Co. v. First Colony*

*Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. 2004)).

With respect to the first two purported breaches, *i.e.,* RMHC's demand to change

---

[1] There seems to be no dispute that Illinois law governs WCI's purported breach of contract claims.  (*See* February 2012 Indemnity Contract at ¶ 9 and August 2011 Consultant Contract at ¶11); *see also Amakua Develop., L.L.C. v. Warner*, 411 F. Supp. 2d 941, 948 (N.D. Ill. 2006) ("Under Illinois law, an express choice of law provision in a contract will be given effect provided that (1) it does not contravene a fundamental public policy of Illinois, and (2) the state chosen bears a reasonable relationship to the parties or the transaction.").

the terms of the raffle investment funding and its cancellation of the $4 million line of credit for the launch of Raffle 2, RMHC correctly argues that WCI has failed to point to any express provisions in the contract precluding RMHC from making such demands or cancelling the line of credit. As a result, WCI's claims for an express breach of contract based on those actions are insufficiently pled and must be dismissed. *See LaSalle Bank Nat'l Assoc v. Paramont Props.*, 588 F. Supp. 2d 840, 856 (N.D. Ill. 2008) (finding no basis for breach of contract claim based on failure to extend financing where no express provision of the contract required opposing party to extend additional financing beyond the maximum commitment of the promissory note at issue); *see also Burke v. 401 N. Wabash Venture, LLC*, No. 08 C 5330, 2010 WL 2330334, at *2 (N.D. Ill. June 9, 2010) ("The Court fails to see how, post-*Iqbal*, a plaintiff could state a claim for breach of contract without alleging which provision of the contract was breached.").

As for the third purported breach, RMHC's unilateral cancellation of Raffles 2, 3, and 4, RMHC directs the Court's attention to section 2.2 of the February 2012 Indemnity Contract. That section provides that:

> RMHC shall have the right to cancel any future Raffle where it perceives the threat of unreasonable and irreparable harm to the Ronald McDonald House Charities of Chicagoland and Northwest Indiana brand caused by operation of the Raffle. In such instance, the parties agree to cooperate in an effort to mitigate losses.

Based on this provision, RMHC argues that any claim that it breached the agreements by terminating Raffles 2, 3, and 4 is directly contradicted by the very terms of the February 2012 Indemnity Agreement. According to RMHC, the undisputed $2.8 million loss from Raffle 1 supports its subjective belief that it faced "unreasonable and irreparable harm" if it were to move forward with the remaining raffles.

In response, WCI argues, for the first time, that it has sufficiently pled a claim for a violation of the implied duty of good faith and fair dealing. Under Illinois law, every contract carries the duty of good faith and fair dealing absent a express disavowal by the parties. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). "The purpose of this implied duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Bank of America, N.A. v. Shelbourne Dev. Grp, Inc.*, 732 F. Supp. 2d 809, 823 (N.D. Ill. 2010) (internal quotations omitted).

To establish a breach of the implied duty of good faith and fair dealing, a party must show "that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties. *LaSalle Bank*, 588 F. Supp. 2d at 857 (*citing Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443-45 (7th Cir.1992)). It is well settled that the breach of the duty of good faith and fair dealing is generally not an independent cause of action. *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (*citing Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1131 (Ill. 2001)). Instead, the implied duty is used as a tool to help courts interpret the terms of a contract and the intent of the parties. *Id.*

Here, citing a number of provisions, including section 2.2 of the February 2012 Indemnity Agreement (quoted above), WCI contends that RMHC was afforded a great deal of discretion, which brings into play the implied covenant of good faith and fair

dealing.[2]  We agree, but only in part.  Pursuant to section 2.2, RMHC is afforded the

discretion to cancel any future raffles where it perceives the threat of harm to its brand.

Although RMHC argues that the threat to its brand was undeniable after the $2.8 million

loss from Raffle 1, WCI has alleged that even such a substantial loss was within the

range of potential outcomes it provided to RMHC.  Drawing all inferences in WCI's favor,

it appears that WCI has attempted to allege, albeit inartfully, that in cancelling the

remaining raffles RMHC breached section 2.2 by abusing the discretion afforded to it,

thereby violating the implied duty of good faith and fair dealing.  In this regard only,

WCI's claim for violation of the implied duty is not a stand alone claim as RMHC

contends.[3]  *See Wilson v. Career Educ. Corp.*, 729 F.3d 665, 673-74 (7th Cir. 2013)

(Darrow, J. concurring) (finding plaintiff pled a proper claim for breach of contract under

an implied covenant of good faith and fair dealing theory even where defendant

exercised the unilateral right to termination afforded under the parties' contract); *LaSalle

Bank*, 588 F. Supp. 2d at 859 (party could proceed on a breach of contract claim

founded on defendant's alleged failure to administer discretionary contract terms in good

faith).  If it so chooses, WCI is granted leave to re-plead its claim for breach of contract

based on the implied duty of good faith and fair dealing with respect to section 2.2 of the

---

[2] Although WCI also cited other contract provisions that purportedly afforded RMHC discretion, there are
no corresponding allegations that RMHC breached those specific provisions.  (*See* WCI's Resp. at 3-4.)
Thus, we fail to see how those provisions are at issue here.

[3] Interestingly, neither party zeroed in on section 10(b) of the August 2011 Consultant Contract as it
relates to the issue of the implied duty of good faith and fair dealing.  That provision actually provides
either party the discretion to terminate the agreement for any reason after completion of the first Raffle.  In
any event, as the Seventh Circuit recently stated, "it bears emphasizing that [a party] can breach the
implied covenant of good faith even though the [agreement] gave [that party] the unambiguous discretion
to terminate the [agreement]..."  *Wilson*, 729 F.3d at 674.

Indemnity Agreement and RMHC's cancellation of Raffles 2, 3, and 4.

It does not follow that WCI has properly pled a claim for the violation of the implied duty based on RMHC's other actions, that is, its failure to provide a donor list, its initial cancellation of Raffle 2, its denial of the stamped signature on the loan documents, and its demand for funding changes. (*See* WCI's Resp. at 4-5.) Again, WCI has failed to point to any provisions of the contract that were breached as a result of those actions. WCI's claims for violation of the duty of good faith and fair dealing on those grounds are truly stand-alone claims and cannot survive. *See LaSalle Bank*, 588 F. Supp. 2d at 858. ("Because the duty of good faith and fair dealing is merely a tool to aid in interpreting contract terms, the Court restricts [its] analysis to those facially viable allegations which relate to explicit contract terms."); *see also Playboy Enter. Int'l, Inc. v. Smartitan Pte. Ltd.*, No. 10 C 4811, 2011 WL 3839711 (N.D. Ill. Aug. 26, 2011).

We will, however, grant WCI leave to amend its complaint to include its claim for breach of contract based on RMHC's alleged failure to pay the fees and costs incurred for Raffle 1 in violation of sections 5(b) and 6 of the August 2011 Consultant Contract. (*See* Countercl. at ¶¶ 36, 76.) Though RMHC argues that any request for compensatory damages for such a breach is improper in light of the liquidated damages provision in the August 2011 Consultant Contract, we decline to strike that request at this stage of the litigation. *See BP Amoco Chem. Co. v. Flint Hills Res.*, LLC, No. 05 C 5661, 2006 WL 2505691, at *6 (N.D. Ill. Aug. 25, 2006) (finding it "premature to strike the request for compensatory damages that may or may not be barred by the exclusive remedy provision..."), *vacated in part on other grounds on reconsideration,* 489 F. Supp. 2d 853

(N.D. Ill. 2007).  With respect to WCI's request for punitive damages, WCI conceded in its response that the request was improper.  (WCI's Resp. at fn 2.)  RMHC's motion is granted on this issue and WCI's request for punitive damages is stricken.

As for RMHC's fourth breach, WCI alleges that RMHC improperly filed this suit instead of resolving it through arbitration as required by the two agreements.  (*See* February 2012 Indemnity Agreement at ¶ 9 & August 2011 Consultant Contract at ¶11.) We recognize that the parties' dispute regarding the alleged settlement agreement could arguably fall within the purview of the arbitration provisions of the agreements.  *See Hoenig v. Karl Knauz Motors, Inc.*, --- F. Supp. 2d ----, 2013 WL 5701400, at *6 (N.D. Ill. Oct. 16, 2013) ("The Seventh Circuit has repeatedly held that the language 'arising out of' is extremely broad and creates a presumption of arbitrability that reaches all disputes having their origin or genesis in the contract.") (quotations omitted).  However, we agree with RMHC that this issue is more appropriately raised through a motion to compel arbitration or a motion to stay this action pending the outcome of any arbitration proceedings.  WCI has not taken either step in this matter and its counterclaim does not seek such relief.  In fact, in response to the motion to dismiss, WCI asks that both RMHC's complaint and its own counterclaim "remain in this forum."  (WCI's Resp. at 8-9.)

While WCI's actions (or inactions) raise the possibility of waiver, that issue is not properly before us because WCI has not sought to compel arbitration or to stay this matter.  RMHC's motion to dismiss is granted with respect to the breach for failure to arbitrate, but we reach no conclusion as to whether the parties' dispute is in fact arbitrable, or whether WCI has waived its right to arbitration.

14

Given our decision to allow WCI to file an amended counterclaim, we comment only briefly on RMHC's motion to strike certain allegations of the counterclaim as immaterial. Though RMHC refers to "several" such allegations, it only specifically addressed paragraph 21. In that paragraph, WCI describes the raffle fundraising industry in Canada and provides an estimate of the fundraising potential in the United States based on market research. (Countercl. ¶ 21.) Like WCI, we view this information as simply providing context and background, and fail to see how it is prejudicial to RMHC. Nor do any other allegations strike the Court as particularly immaterial or prejudicial to RMHC. RMHC's motion to strike pursuant to Rule 12(f) is denied.

## IV.    Conclusion

Plaintiff's motion to dismiss defendant's counterclaim and strike immaterial allegations [31] is granted in part and denied in part as set forth above. WCI is granted leave to file an amended counterclaim and must do so by November 25, 2013. RMHC shall answer or otherwise plead by December 16, 2013. Status hearing set for December 18, 2013 at 9:00 a.m., at which time the Court will set a fact discovery deadline. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: November 4, 2013**

15